State, Associates Jersey Co., & N. J. R. R. Co. v. Mayor, &c., Jersey City.

---

THE STATE, THE ASSOCIATES OF THE JERSEY COMPANY, AND THE NEW JERSEY RAILROAD AND TRANSPORTATION COMPANY, PROSECUTORS, v. THE MAYOR AND COMMON COUNCIL OF JERSEY CITY.

On the 10th of March, 1868, the mayor and common council of Jersey City passed a resolution in the following words : " WHEREAS, Jersey City, with a population of nearly forty thousand inhabitants, does not possess or own exclusively any dock, wharf, or pier fronting the waters surrounding Jersey City ; *and whereas,* in and by a report made to the common council December 3d, 1867, it is therein expressed that the wharves constructed at the end of and over the streets of the city to tide water, are, by reason of their location, free to public use and travel; *and whereas,* such wharves are controlled and monopolized by private parties, to the exclusion of the public therefrom ; therefore, *Resolved,* That the committee on streets and public health, and the street commissioner, are hereby authorized and instructed to remove, without delay, all obstructions from the docks, wharves, and piers constructed over the streets of Jersey City to tide water, to enable the

free use of such docks, wharves, and piers to the public." The associates of the Jersey City Company, the plaintiffs, claimed right in the property referred to in the resolution under grant from Cornelius Van Vorst—the New Jersey Railroad and Transportation Company holding under them. The defendants, the mayor and common council of Jersey City, claim under an alleged dedication of the streets to the tide water, and, by reason of the location, that the streets and wharves were free for public use, and that, under authority of their charter, they had power to remove all obstructions from the docks, wharves, piers, &c., erected over the streets to tide water, according to the resolution above set forth.

On *certiorari*, brought to set aside the resolution, the court *held*—

1. That as it appeared by the defendants' own showing that the city was not in the exclusive possession of the streets and of the docks, wharves, and piers from which obstruction was sought to be removed, and that the plaintiffs were in possession, claiming right to the same as private property, and that the enforcement of the resolution might involve questions of right and title between the parties, and the nature and extent of easements and of alleged dedications made to the public, the party complained of was entitled to notice, and to have his rights determined by process of law.

2. The power to remove obstructions from public streets, as given to the common council by the sixtieth section of their charter, is only a police ministerial power to prevent and relieve the public from such obstructions in the enjoyment of their streets as are apparent and readily ascertainable without the necessity of any adjudication. It does not extend to cases of a doubtful or uncertain nature, and which require to be first lawfully determined.

3. Nothing in the defendants' charter can interfere with or impair the vested rights and privileges of any person or corporation whatever, except as to property taken for public use upon compensation. (§ 79.)

On *certiorari*, to remove and set aside a resolution of the mayor and common council of Jersey City.

Argued before BEDLE, WOODHULL, and SCUDDER, Justices.

For the prosecutors, *I. W. Scudder*.

For the defendants, *S. B. Ransom*.

The opinion of the court was delivered by

BEDLE, J. This *certiorari* brings up for review the following resolution :

" WHEREAS, Jersey City, with a population of nearly forty thousand inhabitants, does not possess or own exclusively any dock, wharf, or pier fronting the waters surrounding Jersey City; *and whereas*, by a report made to the common council December 3d, 1867, it is therein expressed that the wharves constructed at the end of and over the streets of this city to tide water, are, by reason of their location, free to public use and travel; *and whereas*, such wharves are controlled and monopolized by private parties, to the exclusion of the public; therefore,

" *Resolved*, That the committee on streets and public health, and the street commissioner, are hereby authorized and instructed to remove, without delay, all obstructions from the docks, wharves, and piers constructed over the streets of Jersey City to tide water, to enable the free use of such docks, wharves, and piers to the public."

This resolution was adopted March 10th, 1868, by the common council of Jersey City, and approved by the mayor March 13th, 1868.

The Associates of the Jersey Company were incorporated November 11th, 1804. The corporators were then the owners of what was known as Powles Hook, a tract consisting of upland and meadow, bounded on the east by Hudson river, on the north by said river, or the bay commonly called Harsimus bay, and on the south by said river, or the bay commonly called Communipaw bay, together with the right of ferry from the same, and including the right and title of Van Vorst, their grantor, as far as the same extends under the waters of the Hudson river and the bays thereof, opposite the said premises. Powles Hook is the original territory of Jersey City, and the docks, wharves, and piers in question affected by the resolution are all, I believe, connected with it, except, perhaps, at the end of one street. Under the charter of the associates, they were authorized to erect or build any docks, wharves, and piers opposite to and adjoining their said premises, on Hudson river and the bays thereof, as far as they might deem necessary for the improve-

ment of the said premises or the benefit of commerce, and to appropriate the same to their own use. (§ 3, *Charter* 1804; *Laws* 1804, *p.* 367.) By virtue of that section, taken in connection with the other provisions of the charter, the Court of Errors, in the case of the *Associates* v. *Jersey City,* 4 *Halst. C. R.* 715, held "that this section confers on the corporation the right of docking out and filling up to the middle of the river, if they do not interfere with the public right of navigation, and they deem it necessary for the improvement of said premises or the benefit of commerce," and also that the docks or piers thus erected belong to the associates, and that they may appropriate the same to their own use; and, further, "that all the rights of Van Vorst and of the state, to the lands described, &c., to the middle of the river, except the public right of navigation vested in the associates, for the purpose of laying out streets and squares, the erection of docks or buildings, or for any other lawful purpose." The associates had, under their charter, besides their private corporate powers, certain functions of a municipal character: among them, to make and lay out streets and squares. After their incorporation they made a map, on the 15th of April, 1804, called Mangin's map, well known in connection with the history of Jersey City, on which were laid out lots, streets, and squares, and by which the streets and squares were dedicated, and lots afterwards sold. Many of the lots and parts of the streets were then flowed by the tide. Hudson street, being the most easterly street on the map, and running parallel with Hudson river, was all flowed by the tide, except, perhaps, a few feet in one locality. That street has since been filled up, or chiefly so.

On the map were also laid down streets at right angles with Hudson street, running westerly from that street, and on the river side, in line with those streets, are marked what were evidently intended for wharves or piers. In the course of improvement, the associates and their grantees have filled in to the east of Hudson street a good part of the way, about three hundred feet or more in some places in the river,

and built various docks, wharves, and piers, some of which extend partly over the lines of those streets, if the same were extended east of Hudson street, and some of which occupy about or nearly the width of them, if extended to their full width. There are ten streets on the map running to Hudson street, and three parallel with that street, to the west. The wharves or piers within the lines of the streets running at right angles with Hudson street, if extended easterly from Hudson street, are in the possession of the associates, or their grantees or lessees, some of which are allowed to be used by the public, upon payment of wharfage, and some of which are used exclusively for a particular business, as in the case of the associates, with their ferries and gates, the New Jersey Railroad Company, with their works and buildings, and the Cunard Steamship Company, with theirs and gates. This latter company being the lessees of the associates, most, if not all, of the powers of the associates, of a municipal nature, now belong to Jersey City; but nothing in the charter of the city is to be construed to interfere with, or impair the vested rights and privileges of any person or corporation whatever, except as to property taken for public use, upon compensation, as provided for in the act." (*Laws* 1851, *p.* 424, § 79.) The resolution before us admits that Jersey City "does not possess or own, exclusively, any dock, wharf, or pier fronting the waters surrounding Jersey City," and that "such wharves are controlled and monopolized by private parties, to the exclusion of the public;" and there is no doubt of the fact that the wharves, docks, and piers affected by the resolution are all possessed and claimed by private parties, under private claim, and such has always been the character of the possession, from the time of their erection, and the public have used the same or not, as those claiming to be the private owners or lessees would permit, and not because the same were of right free to the public. The resolution asserts a claim to them, founded upon a report to the common council, December 3d, 1867, (which is not before us) that the wharves

constructed at the end of and over the streets, to tide water, are, by reason of *their location*, free to public use and travel, and, on that assumption, the resolution was passed, instructing the street committee or street commissioners to remove all obstructions *from the docks, wharves*, and piers constructed over the streets of Jersey City, *to tide water, to enable the free use of such docks, wharves, and piers to the public*. There is, besides Mangin's map, another map in evidence, made by the associates, in 1857, after a considerable amount of filling in had been done by them, east of Hudson street, according to which some lots newly filled were sold, and on which are marked extensions of some of the east and west streets, over the newly-made ground, as Grand, York, Montgomery, Mercer, and Wayne streets, but having, at the ends of such extensions on the map, marks of docks, wharves, and piers, and which were mostly, if not all, from the indications of the map and evidence, then built, and in the actual use of the ferry, the railroad, and the Cunard company. Essex street, on the map, appears also to have been extended, but, at the end of it, is also marked a wharf or pier. Morris and Sussex streets, lying between Essex and Grand, are not marked as extended on the map by name, but the width of sixty feet is left at the end of each, not opened on the map, and at the end of each of those widths is marked a wharf or pier. The city claims that, by Mangin's map, all the streets were laid out and dedicated to tide water, and that when new land was made or improvements extended, the streets necessarily became extended to tide water. The city also claims that, by the map of 1857, under which sales were made, there was a further dedication of the streets to tide water. These positions involve a question of title to or easement in a large amount of property; and, among other considerations, the extent and character of the dedication of the streets by Mangin's map will have to be determined. Whether the dedication was to tide water or only to wharves and piers, and whether such dedication was the same along Hudson river as on Harsimus and Com-

munipaw bays, or whether the East and West streets were
dedicated any farther than to Hudson street, or what was
the exact extent of the dedication by the map.   Dedication
is a question of intention, and must be judged of by the acts
which accomplish it.   The like or kindred questions, with
others, might have to be determined with reference to the
map of 1857, and its effects, if any.   The position of the city
and the private claimants is this : the latter are in posses-
sion ; they built and have controlled the wharves, &c., in
question, under a claim of right and as owners, while the
city claims that the streets should extend to tide water, and
that the wharves, &c., at and over the ends of the streets
(so-claimed,) are, because located there, free to the public,
and that all obstructions must be removed to enable such
free use.   To that end this resolution was evidently passed.
It is not a resolution simply to remove obstructions from
streets, but it is to remove obstructions from the docks,
wharves, and piers, in order that they may be free.   It is in
plain meaning an effort on the part of the city to determine
the question of title or easement by seizing the possession of
the wharves, &c., from the private possessors, and either
court forcible resistance or compel them to submit to a de-
privation of possession, and bring suit to recover it.   The
resolution is general, and reaches all docks, wharves, and
piers situate at the ends of all streets, and is liable to be
enforced against the prosecutors, the result of which could
only be resistance by force or a submission to the depriva-
tion of possession, and trusting to the slow processes of the
law for its recovery, if so entitled.   It is very important,
then, to inquire whether the right to determine the question
really involved here exists in the common council, if at all,
or by the mode here adopted.   This resolution was not
passed as an ordinance.   An ordinance or by-law requires
nine votes under the charter, (*Supplement*, *Laws* 1852, *p.*
520, § 5.)   This had only eight.   The forty-second section
of the charter, (*Laws* 1851, *p.* 405–7,) enacts that the com-
mon council can pass, alter, and repeal ordinances for the

following, among other purposes enumerated : " to make and lay out all streets, squares, and public grounds, and to establish such as have already been laid out; to ascertain and establish the boundaries of all streets and public alleys in said city, and to prevent and remove all encroachments, encumbrances, and nuisances in or upon the same, and in every other respect to secure to the public and the adjoining owners the safe and convenient use of the streets and sidewalks, squares and public grounds, for the purpose for which they are or may be laid out and dedicated." Also, "to declare, by general law, what shall be considered nuisances in lots, streets, docks, wharves, and piers, and to direct, provide for, and to enforce their removal, and to provide for the sale or other disposition of all encumbrances on the streets, sidewalks, docks, wharves, and piers." This resolution cannot, without the intervention of an ordinance, be sustained under the immediate authority of any of those powers mentioned, or any others, that are to be exercised by ordinance, as it had an insufficient number of votes to pass it. The sixtieth section of the charter provides " that the common council shall have power to grade, pave, and remove obstructions in all streets, public grounds, and public squares that are or may become public streets, public grounds, and public squares or highways, by dedication or otherwise," without stating the mode in which those objects may be accomplished; but undoubtedly the authority to remove obstructions under that section may be exercised to a certain extent by resolution merely, passed by a majority of a quorum of the council. The question then arises, is this resolution a legitimate exercise of that authority, and if not, can it be sustained as an order simply to execute ordinances passed under any of the powers concerning which ordinances may be passed—this latter question involving the power of the council, even by ordinance, to determine a right such as lies at the foundation of this resolution ? Is this resolution, then, a proper exercise of the power to remove obstructions in the sixtieth section ? That power in this section is only a police ministerial

State, Associates Jersey Co., & N. J. R. R. Co. v. Mayor, &c., Jersey City.

power, to prevent and relieve the public from such obstructions in the enjoyment of their streets as are apparent or readily ascertainable, without the necessity of any adjudication. Its exercise is based upon the idea that the use of a lawfully existing street, actually used by the public, has been obstructed partially or entirely by the act of God or man, and the *fact* of which obstruction is seen or may be reasonably known, without undertaking to settle doubtful or uncertain rights of property. This is a different power from that which determines the boundaries of a street, in order to ascertain whether it has been encroached upon or not. It is difficult to draw the precise line, like many of the powers of municipal corporations, between the two powers; but there is clearly a most material distinction. The latter requires action of a judicial nature, and parties affected by the alleged encroachments have a right to be heard; while the former, being but a ministerial power, can be exercised only to the extent that the right is clear or may be reasonably known, and so that it does not invade such rights as from their doubtful or uncertain nature need to be first lawfully determined. This distinction necessarily results from the careful regard of the law to private property, and an analogy is found in the road act, (*Nix. Dig.* 829, § 32,*) which provides that if it be doubtful to the overseer who hath narrowed or encroached on the highway, the owner or the party may apply to two justices of the peace and the surveyor of the highways of the township, to determine the same, and under that proceeding notice must be given. *Vantilburgh* v. *Shann*, 4 *Zab.* 740.

The power, then, of the sixth section cannot be used to judicially determine rights of private property, and whenever it is used as a guise to that end it is illegal. *Austin* v. *Murray*, 16 *Pick.* 126.

Now, we cannot shut our eyes to the fact that the existence of the street, where the wharves, &c., are located, is seriously in doubt at least, and that that question needs judicial consideration; also, that the wharves, &c., are not

*Rev., p. 1005, § 49.*

regarded by the common council as obstructions to the street, even on the supposition that the streets go to tide water. The resolution contemplates their continuance, and directs the removal of obstructions from the wharves, &c., (not streets,) that they (the wharves, &c.,) may be free to the public. The objective point of the resolution is the throwing open of the wharves, &c., to public use, assuming what is fairly in controversy against the city, that there is a lawful street where they stand. The fee of the soil is undoubtedly in the private parties. The claim of the city is of a public easement over the wharves, docks, and piers erected on it. The *locus* is not *de facto* a street. The wharves were built by private enterprise, and are now under private control, and any removal of improvements to defeat the private occupation, such as may be exercised over private wharves in this state, (subject, of course, only to municipal regulation,) and give the public the free use, must depend upon whether there is a lawful easement there; to permit it to be determined under the sixtieth section would be a prostitution of the power therein, and an invasion of private rights that should be otherwise settled. The resolution cannot, then, be sustained under that section. Besides, if it should be executed and these prosecutors deprived of any of their possessions, it could accomplish nothing else, but might lead to a breach of the peace and a most serious injury to private rights and property, which the superintending power of this court over city ordinances on the ground of unreasonableness should prevent, by setting aside the resolution, where it is apparent that the right involved should be judicially settled.

The next question is, whether the resolution can be sustained as an order to execute other ordinances, and what is the power of the council to determine the right here involved by any ordinance? The latter question need not be fully pursued. Several ordinances have been produced before us containing general provisions in regard to removing obstructions and nuisances from streets, regulating the use of

State, Associates Jersey Co., & N. J. R. R. Co. v. Mayor, &c., Jersey City.

wharves, docks, and piers—declaring what are nuisances in or upon the same, and also declaring the duties of the street commissioner and other persons as to their removal. These are all general ordinances, and so far as they provide, generally, for the removal of obstructions, encumbrances, or nuisances in streets, are to be executed as ministerial duties in existing streets that may be known, without the exercise of judicial functions. Whenever the street is uncertain, so that the encroachment or obstruction depends upon uncertain location or boundaries, then special action must be taken by the council under the power to ascertain and establish the boundaries of streets, or to establish such as have already been laid out. These duties must be performed by ordinance under this charter and are of a judicial nature, at least so far as private rights of property are affected, and in all such cases the parties interested are entitled to notice and to be heard, and the action of the council must be taken specially with reference to the particular street or streets claimed to be encroached on, and a way provided by which the parties may be heard, and personal notice given, in the absence of any other statutory mode. This resolution cannot be sustained upon the strength of any of these ordinances concerning streets, as they are not special, and the parties are without notice of any kind.

The ordinances concerning obstructions and nuisances on wharves, &c., are also general, and based upon two powers in the charter, one already stated—to declare, by general law what shall be considered nuisances on docks, wharves, and piers, and to provide for their removal, and for the sale and disposition of all encumbrances on them. The object of this is not to interfere with the private ownership, but only to regulate and govern the use. It is merely to exercise a police power over the use, and not to divest the right of property. Regulations to this end are allowable, subject to the control of this court as to whether they are reasonable, and so far as private property may be affected by such reasonable regulations it must bear it for the public good,

the damage, if any, being *damnum absque injuria*, and the law presuming that the owner is compensated by sharing in the advantage of the beneficial regulation. *Baker* v. *Boston*, 12 *Pick*. 193. Now, if this were a resolution merely to remove all nuisances from the wharves, there would be some reason to treat it as an order to execute the ordinances passed under that clause, but it is not. It is to remove obstructions from the wharves to enable the free use to the public. Its scope and intention are to remove, so as to divest the control of private parties. The power to declare nuisances and to provide for their removal was not intended to interfere with the ownership of the wharves in whomsoever it might be. The other power upon which these ordinances as to the wharves is based, is claimed under the seventh subdivision of section forty-two of the charter, which is " to order and regulate the building of all docks, piers and wharves in and about said city, and to regulate said docks, wharves, and piers, and the use thereof when built, and the rates of wharfage, and to make such by-laws and regulations touching the same, not inconsistent with the laws of this state and the United States, as to them may appear proper and necessary, and to order and direct that all lands under water between high water mark and the place where such dock, wharf, or pier may be built or extended, and for such width as they may deem advisable, shall be filled in by the owner of such dock, wharf, or pier, or of the shore, or shore right from whence such dock, wharf, pier, or filling up may be directed ; and in case more land is thus filled in than may be necessary for the use of said wharf, as a wharf or dock, to lay out proper streets upon the same, and the residue thereof, not wanted for wharves or streets, may be appropriated to his own use, &c., &c., but the parts reserved for public streets and a wharf shall be held by such person or his assigns, for such purposes only, provided that the improvements contemplated by this paragraph shall not be made without the consent of a majority in interest of the owners of the shore in front of which the proposed improve-

State, Associates Jersey Co., & N. J. R. R. Co. v. Mayor, &c., Jersey City.

ment is to be made," &c.  There is some question as to the precise application of the word "improvements," in the proviso; also of the exact application of the subdivision of lands of the associates.  There may be a point given by which, through the action of the common council, the right of the state to lands under water in front of the shore owner may be divested; but however these matters may be, it is clear that the authority concerning docks, wharves, and piers, in that provision, (seventh subdivision), cannot be exercised inconsistent with private ownerships.  It is a regulating and governing authority, consistent with such ownership, and none of the ordinances before us, so far as I can discover, seek to go further.  In fact, nothing in the charter can interfere with or impair the vested rights and privileges of any person or corporation whatever, except as to property taken for public use upon compensation, (§ 79.)  This resolution seeks, as already stated, to divest private control entirely.  No ordinance could be passed to do that, and hence if any has been attempted it cannot serve to give any force to this resolution as an order merely for its execution.

The only show of power now that is left for the council to determine the right in question is under the section to ascertain and establish the boundaries of streets and to remove encroachments, and to establish streets already laid out.  The acts, of course, must be done by ordinance, but it is not advisable or necessary now to express any opinion as to their scope.  It is well, however, to intimate, that ascertaining and establishing boundaries and removing encroachments pre-suppose the lawful right to the street, and that the uncertainty to be settled is only of location or boundary; but when it appears that the real matter in dispute is not of location or boundary, but of the actual legal existence of a street in a certain locality, depending upon the character and legal effect of a dedication, we ought to hesitate long before sustaining any ordinance that would forcibly, if carried out, change the possession of those in control, and per-

haps jeopardize their property or subject it to other uses until they obtained redress by law.

The same remarks would also apply to the power to establish a street that had been laid out where private rights were involved, depending upon the legal existence of the street, and where the city did not seek to compensate for admitted private property.

The considerations stated dispose of this resolution without deciding the question of title or easement in dispute between the city and the prosecutors. It has been urged by the counsel of the city, that that question could not be decided on this *certiorari*, and referring to the case of *Jersey City* v. *The State*, in the Court of Errors, 1 *Vroom* 521, as an authority. That case was peculiar. It was on *certiorari* removing an ordinance and assessment for paving and improving a street. It was *de facto* a street. The court held that, on *certiorari*, the width of the street could not be questioned, citing *The State* v. *Jersey City*, 5 *Dutcher* 441 ; but, notwithstanding that, the court did hold, as I understand it, that the street was, *de jure*, the full width claimed by the city. The court, in 5 *Dutcher*, say that for the purposes of that case, which was a *certiorari* to set aside an assessment for a sewer, a road used and occupied by the public for more than twenty years as a street, will be regarded as a street within which the sewer may be rightfully located, and that whether a lawful street could not be tried and decided on that collateral proceeding. Those two cases, then, seem to me only to decide—notwithstanding some expressions in the case in 1 *Vroom*—that where there is a *de facto* street in actual use to a certain extent, the court will not decide in a collateral proceeding, such as on *certiorari* of an ordinance, or assessment for paving or sewer, the lawful *status* of the street. Those proceedings could not divest possession, as it was not in the prosecutors ; but in a case like this, where the public have no possession or *de facto* use, and the possession is in private hands, and the resolution is a direct attack upon it, I think that, on *certiorari*, the court should and will

look into title, to see that private rights are not illegally taken away. Such action will not effectually settle title, but it may settle the resolution and leave the parties to judicial remedies. This principle is founded in legal analogy. In proceedings to take land for public roads or streets, wherever it is claimed that no assessment has been made to the owner, the practice is to prove title to defeat the proceeding. The court must try and decide it, and test the legality of the proceeding by it. Were it necessary in this case to test this resolution on the strength of the easement claimed, I would not hesitate to do it, as law; but that question is advisedly left open, it being unwise to decide it without more careful consideration.

This resolution must be wholly set aside. It is so liable to abuse and injustice, that it would be unreasonable to try to restrict its operation.

CITED *in State, Story, pros., v. Bayonne,* 6 *Vr.* 337 ; *State, Bodine, pros., v. Trenton,* 7 *Vr.* 203 ; *State, Marshall, pros., v. Trenton,* 7 *Vr.* 287.